UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
BARBARA STINSON,

                                      Case No.: _____

                         Plaintiff,

          -against-

HOUSLANGER & ASSOCIATES, PLLC,
TODD HOUSLANGER,
DEMI, LLC d/b/a DEMI OF NEW YORK,
MATTHEW BLAKE,
BRYAN C. BRYKS, and
HARRY TORRES
--------------------------------------------------------------------X
ORIGINAL COMPLAINT AND JURY DEMAND

       Plaintiff Barbara Stinson brings suit against a debt collection law firm, HOUSLANGER

& ASSOCIATES, PLLC (the "PLLC"), as well as its principal, TODD HOUSLANGER, its

Director, MATTHEW BLAKE, and an associate, BRYAN BRYKS, (collectively "Houslanger"),

the putative judgment creditor DEMI, LLC and its Managing Director, also Matthew Blake

(collectively "DEMI") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. §

1692 *et seq.*, N.Y. Gen. Bus. Law § 349 and for conversion; against process server HARRY

TORRES for his violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

and N.Y. Gen. Bus. Law § 349; and against the PLLC, Mr. Houslanger, and Mr. Bryks for their

violations of N.Y. Jud. § 487.

**Summary of Claims[1]**

       Putative assignee-creditor DEMI, through its debt collection law firm Houslanger, sued

Ms. Stinson on a time-barred account that she never owed, and used a false affidavit of service

executed by Harry Torres to obtain a default judgment. Ms. Stinson first learned of the lawsuit

---

1 This summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid
out in far greater detail in the statement of facts.

filed by DEMI when, twelve years after entry of the fraudulently obtained judgment, Houslanger attempted to garnish her wages. Ms. Stinson, *pro se*, filed an original Order to Show Cause ("OSC") to vacate the default judgment, a Second OSC to correct a technical defect, and then a Third OSC after she was finally able to obtain the affidavit of service and rebut the specific allegations therein. Harry Torres executed an affidavit of service claimed to serve Ms. Stinson at an address she had not lived for many years, and claimed service was made by leaving the summons and complaint with her son. In the Third OSC, Ms. Stinson documented with a death certificate that her son died as a child and was dead years before the date of alleged service; and documented with W-2 tax forms, pay stubs, DMV records, and voter registration documents that she had not resided for years at the address where she was allegedly served. Further, Defendants DEMI and Houslanger admitted in writing they had no evidence to establish the existence of the putative debt. In the face of this irrefutable and undisputed evidence supporting the vacature of the default judgment and dismissal of the collection lawsuit, Defendants DEMI and Houslanger attempted to dupe Ms. Stinson into signing a Stipulation Vacating Judgment "so that you may avoid the further inconvenience of coming to Court" that, in fact, buried a release of potential claims Ms. Stinson may have against Defendants. When Ms. Stinson refused to release any claims she might have, Defendants DEMI and Houslanger forced her to once again go to court, opposed her order to show cause, and held over Ms. Stinson's head that they could continue to garnish her wages if Ms. Stinson, *pro se*, lost her motion to vacate the default judgment. Ultimately, the state court judge issued a ruling vacating the judgment and dismissing the lawsuit finding that, in fact, Ms. Stinson was never served. Moreover, Legal Services and volunteer attorneys providing free legal advice to *pro se* consumers are noticing a widespread pattern and practice of debt collection law firms – especially Houslanger – demanding in all cases -- even in

cases of clear sewer service[2] -- that any stipulation to vacate judgment include a release of any FDCPA claims the consumer may have against the debt collection law firm and its client. The debt collection law firms bury the mutual release language deep in the complicated legal jargon of a stipulation to vacate judgments. Consequently, most *pro se* consumers are duped into signing the stipulation not realizing that they are giving up rights they may have against the debt collector. This egregiously deceitful pattern and practice guts the very protections from deceptive or unfair debt collection practices that the Fair Debt Collection Practices Act was enacted to prevent.

## A.  JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in New York County, New York.

## B.  PARTIES

---

2  *See, e.g. Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) (""[S]ewer service" [is] the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.")

3.      Plaintiff Barbara Stinson is an individual residing in Westchester County, New York.

4.      Defendant HOUSLANGER & ASSOCIATES, PLLC ("the PLLC") is a professional corporation organized and existing under the laws of the State of New York, with its principal place of business at 372 New York Ave., Huntington, NY 11743.

5.      Defendant TODD HOUSLANGER is the principal and sole member of the PLLC and, on information and belief, organizes, manages, and controls the operation of the PLLC. Mr. Houslanger, on information and belief, is a resident of the State of New York.

6.      Defendant MATTHEW BLAKE is, according to Mr. Houslanger, the Director of Recovery Operations at the PLLC and is "integral" to the operation of the PLLC.  *See* **Exh. A** (LinkedIn website profile of Matthew Blake). **3**  He has worked at the PLLC for 17 years. *Id*. According to the New York eCourts records, the PLLC filed all 1,295 collection lawsuits filed in the name of DEMI in New York. On information and belief, Mr. Blake signed the verifications and Affidavits of Facts in those suits, just as he did in Ms. Stinson's case. Mr. Blake regularly collects or attempts to collect, directly or indirectly, debts owed, or due or asserted to be due another, and that is his principal purpose. Mr. Blake therefore is a debt collector within the meaning of 15 U.S.C. § 1692a(6). On information and belief, Mr. Blake is a resident of the State of Connecticut.

7.      Defendant BRYAN C. BRYKS is an associate attorney at the PLLC and, on information and belief, is a resident of the State of New York.

8.      The PLLC, Mr. Houslanger, Mr. Blake, and Mr. Bryks are collectively "Houslanger."

9.      The PLLC Mr. Houslanger regularly collect or attempt to collect, directly or indirectly,

---

3 All Exhibits attached to this Complaint are incorporated by reference in their entirety.

debts owed, or due or asserted to be due another (e.g. the putative creditors in collection lawsuits), and that is their principal purpose. The PLLC collects debts by filing thousands of collection lawsuits, collecting on thousands of putative judgments, and sending thousands of collection letters, and that is their principle purpose, and it is what it regularly does. Many, if not most of the summons and complaints filed by the PLLC, as well as the income executions, information subpoenas, and bank restraints go out under the putative signature of Mr. Houslanger. Therefore, the PLLC and Mr. Houslanger are each debt collectors within the meaning of 15 U.S.C. § 1692a(6).

10.     Mr. Bryks, an associate at the PLLC, regularly collects or attempts to collect, directly or indirectly, debts owed, or due or asserted to be due another (e.g. the putative creditors in collection lawsuits), and that is his principal purpose as an attorney at the PLLC. For the collection lawsuits filed by the PLLC, Mr. Bryks files motions, executes affirmations in support of motions, appears at the court hearings on motions, and negotiates with (almost exclusively *pro se*) consumers to extract payments, sign stipulations of settlement, or seeks to enter judgment. On information, most if not all of the settlement agreements Mr. Bryks demands includes language similar to the language used as to Ms. Stinson burying a release of potential claims against the PLLC and the putative creditor. Mr. Bryks also regularly has debt collection telephone calls with (almost exclusively *pro se*) consumers. Therefore, Mr. Bryks is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

11.     DEMI, LLC d/b/a DEMI OF NEW YORK ("DEMI") is a foreign corporation incorporated in the State of Rhode Island, with a principle place of business of 210 Blackstone Blvd., Providence, RI 02906. DEMI regularly conducts business in the State of New York and this action arises from such conduct.

12.     Defendant DEMI purchases charged-off putative consumer debts, and seeks to collect on putative defaulted consumer debt directly and through debt collection law firms such as Houslanger. The collection law firms send collection letters, file collection lawsuits, and execute on putative judgments on behalf of DEMI. DEMI does so regularly, and that is its primary (and indeed exclusive) function. DEMI is therefore a debt collector within the meaning of 15 U.S.C. § 1692a(6).

13.     Blake, in addition to being the Director of Recovery Operations at the PLLC, was also the "Managing Director" of DEMI. Mr. Blake verified the collection lawsuit against Ms. Stinson, and executed the Affidavit of Facts in support of the default judgment against Ms. Stinson. On information and belief, Mr. Blake regularly signs the verification and Affidavits of Merit in suits filed by DEMI.

14.      Mr. Blake is also the managing agent for five debt collection agencies registered with the New York City Department of Consumer Affairs. As such, Mr. Blake regularly collects or attempts to collect, directly or indirectly, debts owed, or due or asserted to be due another, and that is his principal purpose.  Mr. Blake is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

15.     Therefore, this lawsuit will refer to DEMI, LLC d/b/a DEMI OF NEW YORK and Matthew Blake collectively as DEMI.

16.     Houslanger was an agent of DEMI acting within the course and scope of its agency in seeking to collect the putative debt and resulting judgment from Ms. Stinson. Therefore, DEMI is jointly and severally liable for the acts taken by Houslanger on DEMI's behalf. DEMI is also directly liable for its own misconduct as the party in the collection lawsuit.

17.     Mr. Blake is the Director of Recovery Operations at the PLLC and has worked at the PLLC for 17 years, and thus he is, by Mr. Houslanger's own estimation, integral to the operation of the PLLC. He also served as the Managing Director of DEMI LLC, and in this role signed the verification and the sworn Affidavit of Facts in support of the default judgment as to Ms. Stinson, and, on information and belief, for the 1,295 collection lawsuits the PLLC filed for DEMI, LLC in New York. Mr. Blake, on information and belief, was a decision maker in the conduct that gives rise to the liability of the PLLC, Mr. Houslanger, and DEMI, LLC in this action.

18.     Defendant HARRY TORRES was the process server who executed the false affidavit of service contending, *inter alia*, he served the collection lawsuit on Ms. Stinson's son, who had been dead for 25 years. Mr. Torres is a notorious sewer service process server whose license was suspended by the New York City Department of Consumer Affairs. Mr. Torres regularly fails to serve summons and complaints and regularly executes false affidavits of service allowing debt collectors, including Houslanger and DEMI, to enter default judgments against consumers such as Ms. Stinson. Mr. Torres is therefore a debt collector as defined by 15 U.S.C. § 1692a(6).

## C.   STATEMENT OF FACTS

### *The Collection Lawsuit and entry of default judgment.*

19.   On December 13, 2005, DEMI LLC, through its collection law firm HOUSLANGER & ASSOCIATES, PLLC ("the PLLC") under the putative signature of Mr. Todd Houslanger,  filed a collection lawsuit in New York County Civil Court captioned *DEMI LLC  vs. Barbara Stinson*, New York Civil Court, Index No. CV-062732-05/NY ("the Collection Lawsuit"). ***See* Exh. B (summons and complaint).**

7

20.   The Collection Lawsuit sought to collect $8,745.12 from Ms. Stinson based on a putative Discover Bank credit card debt allegedly assigned to DEMI that allegedly defaulted on November 30, 2002.

21.   Ms. Stinson has never, to her recollection, had an account with Discover.

22.   Moreover, Ms. Stinson was never served a copy of the summons and complaint or received a copy of the lawsuit in the mail.

23.   However, on February 1, 2006, process server Harry Torres executed a false affidavit of service. *See* **Exh. C (affidavit of service).**

24.   Houslanger and DEMI then used the false affidavit of service to obtain a default judgment against Ms. Stinson on May 26, 2006.  The use of a false affidavit to obtain a default judgment is commonly referred to as "sewer service." The judgment was for $8,900.12, plus 9 percent per year post-judgment interest.  *See* **Exh. D (default judgment).**

25.   Defendant Matthew Blake as the "Managing Director" of DEMI, LLC signed the verification for the Collection Lawsuit and the Affidavit of Facts used in support of the application for default judgment. *See* **Exh. A (summons and complaint)** and **Exh. E (Affidavit of Facts)**. Mr. Houslanger notarized both documents. *Id.*

### *The Collection Lawsuit was time-barred on its face.*

26.   The Collection Lawsuit was time-barred on its face. The putative original creditor was Discover Bank. The New York Court of Appeals has specifically held that that the statute of limitations for Discover Bank credit card accounts is three years. *Portfolio Recovery Assoc., LLC v. King*, 927 N.E.2d 1059, 1061 (N.Y. 2010). This is because Discover Bank is a resident of Delaware; the statute of limitations for credit card debts is 3 years in Delaware and under New

York's borrowing statute, N.Y. C.P.L.R. 202, the limitations period is that of New York or the residence of the creditor, whichever is *shorter*. *Id*.

27.   The face of the Collection Lawsuit alleges the claim against Ms. Stinson accrued on November 30, 2002 when she allegedly "failed to make the monthly payments when due… although duly demanded." *See* **Exh. B**, p. 3, ¶ 5 (verified complaint). As noted on the file stamp on the very bottom of the summons of the Collection Lawsuit, the suit was not filed until December 13, 2005. *Id*. p. 1. On its face, the Collection Lawsuit was filed 13 days too late.[4]

28.   By filing, serving, and continuing to litigate time-barred collection lawsuits, Houslanger and DEMI falsely represent to consumers including Ms. Stinson and to the Court that their lawsuits have merit when, in fact, the claim is barred by the statute of limitations. Houslanger and DEMI misrepresent that the lawsuits are timely filed to deceive consumers into believing that the suits cannot be challenged on statute of limitations grounds, that any attempt to challenge the lawsuit on statute of limitations grounds would be futile, and that they should not challenge the suit in court but instead pay the amount demanded. Moreover, the purpose of these misrepresentations is to deceive the civil court into entering judgment on time-barred claims, and awarding costs of court

---

4 This is not just a happenstance of letting the limitations period slip by a few days but a conscious decision by Houslanger and DEMI to file collection lawsuits that would be time barred by the application of the borrowing statute.  Prior to *King*, New York debt collection law firms ignored the plain text of the borrowing statute and filed *all* credit card collection lawsuits assuming the 6 year New York statute of limitations controlled. In post-*King* FDCPA litigation debt collectors argued that *King* was a change in the law – at least as to how debt collectors had been calculating the statute of limitations – and thus it would be unfair to allow FDCPA, GBL 349, and Judiciary Law 487 claims to proceed against them for having filed collection lawsuits that would be time barred if the borrowing statute were applied. Given the enormous volume of pre-*King* collection lawsuits, one mass-filing debt collection law firm argued, it "would be catastrophic to the industry, in particular to collection law firms similar to the defendant" who did not calculate the statute of limitations based on the borrowing statute. *Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV 3920 ERK, 2012 WL 661456, at *4 (E.D.N.Y. Feb. 28, 2012), *report and recommendation adopted*, No. 10 CV 3920 MKB CLP, 2012 WL 1882976 (E.D.N.Y. May 24, 2012).  The Court in *Diaz* held *King* was not a change in the established law and therefore Plaintiff stated claims under the FDCPA, GBL 349, and Judiciary Law 487 for the collection law firm having filed pre-*King* collection lawsuits that would be time barred by the application of the borrowing statute. There is no reason to think that Houslanger and DEMI in the case at bar acted any differently than the rest of the industry in ignoring the borrowing statute in the calculation of the statute of limitations, at least in pre-*King* collection lawsuits.

when the judgment creditors are not so entitled.

29.     In filing, serving, and continuing to litigate the time-barred lawsuit, Houslanger and DEMI represented that Houslanger had performed a meaningful attorney review of Ms. Stinson's account and determined, based on professional attorney judgment, that the lawsuit was timely.

30.     If the PLLC and Mr. Houslanger had performed a meaningful attorney review, they would have, at a minimum, established the governing statute of limitations period by checking which state the putative original-creditor resided in and thus what the governing statute of limitations was in that state, so that it could be determined whether the putative debt was outside that state's statute of limitations. Either the PLLC and Mr. Houslanger failed to perform a meaningful attorney review — despite their implied representations to the contrary — or they had performed the meaningful attorney review, realized the debt was time barred, and then still filed, served, and continued to litigate the case, including the opposition to the Order to Show Cause to vacate the judgment on the time-barred putative debt.

31.     Houslanger knows it required to perform a meaningful attorney review, and that such a review specifically requires a determination whether a notice of assignment of the putative judgment was sent to the consumer prior to their attempting to collect on an assigned judgment. Houslanger knew of these requirements because that was a holding in a case where it was a defendant. *Musah v. Houslanger & Assocs., PLLC*, 962 F. Supp. 2d 636, 641 (SDNY 2013) ("although ordinarily an attorney's determination that there exists a valid judgment may obviate the need for further review of a case file, in situations such as the instant case, where the judgment was assigned to a third party, §1692e(3) requires that an attorney seeking to collect that judgment engage in a review of the case file sufficient to determine that the judgment debtor received notice of the assignment"). In *Musah*, the Court held that the consumer stated a claim

against Houslanger by alleging Houslanger did not check to see whether a notice of assignment was sent to the consumer prior to Houslanger collecting on an assigned judgment.

### *Ms. Stinson first learns of the Collection Lawsuit*

32.   In February 2018, twelve years after the entry of the default judgment, Ms. Stinson first learned of the Collection Lawsuit when Defendants sought to garnish her wages.

33.   Ms. Stinson has never been provided with a notice assignment of the putative debt at issue from the original creditor Discover through to DEMI. This assignment, assuming one did occur, had to have occurred after the alleged default on November 30, 2002 but before Houslanger filed the lawsuit on December 13, 2005. Ms. Stinson did not receive a notice of assignment during this period, or at any other time, that the putative debt would have been allegedly assigned.

34.   On or about February 12, 2018, Westchester County Sheriff Martin J. McGlynn mailed Ms. Stinson a letter demanding payment for $19,209.48. The Sheriff calculated that amount by summing the amount of the judgment of $8,900, the post-judgment interest of $9,394.74, and Sheriff poundage and unpaid fees of $914.74.   ***See* Exh. F** (Sheriff letter with income execution). Ms. Stinson's receipt of this letter was the first time she learned of the Collection Lawsuit or the judgment.

35.   Ms. Stinson was shocked by the demand– it was about half of what she made in a year working as a nursing assistant at a nursing home of elderly priests. And it was accruing interest at 9 percent, so that she would never be able to pay it off. She burst out crying when she received the letter.

36.   The Sheriff's letter enclosed an income execution signed by Mr. Houslanger and

addressed to both Ms. Stinson and her employer's payroll department.

37.    After learning about the judgment, Ms. Stinson immediately called the PLLC. The PLLC informed Ms. Stinson that they were seeking to collect a judgment based on a Discover Bank credit card. Ms. Stinson informed the firm that she never had a Discover account, that she was not served a copy of the lawsuit, and did not know about the lawsuit until she received the notice from the Sheriff. Despite this, the Houslanger firm demanded she pay the judgment, and offered to settle for a lump sum payment of $15,000.

### Ms. Stinson, pro se, files multiple orders to show cause to vacate sewer service judgment

38.    Scared and confused, Ms. Stinson went to the NY Civil Court to see what she could do to stop Houslanger and DEMI from garnishing her wages.

39.    Over the next three months, Ms. Stinson, *pro se*, had to return to Court repeatedly to fight the sewer service judgment, for a time-barred debt, for an account she never had. Sometimes she had to go back to Court because she had to file multiple orders to show cause, or had to go to a legal clinic to help fill out forms, but mostly she had to go back because Defendants intentionally dragged out the process attempting to wear her down. And she had to take off from work for each of these trips to Court.

40.    Ms. Stinson was *pro se* during the entire period in state court.

41.    On February 21, 2018, Ms. Stinson went to court and filed an initial Order to Show Cause ("OSC"). She had to take off from work to go. Unfortunately, she filled out the form incorrectly and had to go back to Court.

42.    On February 22, 2018, Ms. Stinson went back to Court and filed out a Second OSC. She again had to take off from work. Ms. Stinson averred in her affirmation in support of the

application that she was never served, having first learned of the lawsuit when she received the demand from the Sheriff, and that she never had a Discover credit card. She sought to have collection activities stayed, the judgment vacated, and the action dismissed or to be allowed to answer and defend the action. Finding merit to the application, Civil Court Judge Leticia M. Ramirez signed the OSC that day, staying collections until a ruling on the application, and set a hearing date for March 9, 2018. *See* **Exh. G (Second OSC)**.

43.   Given that it was twelve years since Houslanger and DEMI had filed the Collection Lawsuit, the court file was in the clerk's off-site archives facility. Ms. Stinson was therefore unable to review the affidavit of service. She did not know what the process server alleged in his affidavit of service, and thus could not attempt to rebut in her Second OSC whatever specific allegations made in the affidavit of service.

44.   On February 23, 2018, Ms. Stinson went to the post office and, as directed by the Court, mailed the Second OSC to Houslanger and the Sheriff with proof of mailing, and of course incurred the expense of that postage. Ms. Stinson then executed a certificate of mailing and brought it to the next hearing.

45.   Houslanger and DEMI opposed the Order to Show Cause. Bryan Bryks, the associate at the PLLC, executed the Affirmation in Support of the Opposition to the OSC on March 9, 2018. Houslanger and DEMI intentionally withheld from executing the Affirmation in Opposition to the OSC (the "Opposition") until March 9, 2018 so that Ms. Stinson would not receive her copy in the mail until after the March 9, 2018 morning hearing on her application. **See Exh. H (OSC Opposition).**

46.   By delaying service of the Opposition, Houslanger and DEMI intentionally prevented Ms. Stinson, *pro se*, from being able to prepare a response to the Opposition in advance of the

hearing, and, at a minimum, forced her to take off from work again for another hearing. That is what happened.  Houslanger and DEMI delayed sending the opposition to wear down Ms. Stinson by forcing her to have to come to court again and again in hopes that she would default at the next hearing or be pressured to make a payment on the sewer service judgment.

47.    Houslanger attached the false affidavit of service to their OSC Opposition attached and used the Torres false affidavit of service to oppose vacature. The OSC Opposition was the first time Ms. Stinson was able to see the affidavit of service.

48.    Therefore at the March 9, 2018 hearing Ms. Stinson withdraw her OSC without prejudice in order to file an amended OSC where she could challenge the specific factual allegations in the affidavit of service. *See* **Exh. I (order withdrawing OSC without prejudice).**

### *"Serving" dead son is clearly sewer service*

49.    After withdrawing her Second OSC, Ms. Stinson had to go back to the courthouse, this time to meet with the volunteer attorneys at CLARO.

50.    The Civil Legal Advice and Resource Office (CLARO) provides limited legal advice to low-income New Yorkers being sued by debt collectors. CLARO is organized through the New York State Courts Access to Justice Program. The CLARO Program's volunteer lawyers meet with individuals and advise them on how best to represent themselves in their court cases. The advice includes explaining the court process, reviewing their case files, preparing court papers and giving advice on other consumer debt issues. Unfortunately, CLARO cannot represent the consumers in court, and did not represent Ms. Stinson.

51.    Ms. Stinson learned at CLARO what type of documents to gather to challenge the allegations in the affidavit of service and to attach to a new affidavit in support of a new OSC. Over the next several days Ms. Stinson took off from work and began seeking and gathering

necessary documents, including documents establishing her actual residence twelve year ago, that date of alleged service. Most painfully, Ms. Stinson had to get the death certificate of her son Robert who the process server claimed to have delivered the summons and complaint.

52.   On March 26, 2018, after gathering the necessary documentation, Ms. Stinson yet again went to the courthouse and again met with the volunteer attorneys at the CLARO clinic.

53.   On March 26, 2018, Ms. Stinson executed an Affidavit In Support of her Third OSC, this time providing documentary evidence to rebut the allegations in the Torres affidavit of service. *See* **Exh. J (Stinson Affidavit in Support of OSC) (the "Third OSC")**.

54.   On March 27, 2018, Ms. Stinson filed the Third OSC with the Court. She again had to take off work to do so. Finding merit in Ms. Stinson's application, on March 27, 2018 Judge Leticia M. Ramirez signed the Third OSC staying collections the same day, and set a hearing on the application for April 12, 2018.  *See* **Exh. K (order staying collections and setting hearing).** Judge Ramirez instructed Ms. Stinson to serve the Third OSC and order setting hearing on Houslanger and the Westchester County Sheriff via first class mail with certificate of mailing by April 2, 2018, and to bring a copy of proof of service to the hearing. *Id.*

55.   On March 28, 2018, Ms. Stinson again took off from work, went to the post office and, as directed by the Court, mailed the Third OSC and order setting hearing to Houslanger and the Sheriff with proof of mailing, and of course incurred the expense of that postage. ***See*** **Exh. L (proof of mailing).** Ms. Stinson then executed a certificate of mailing and brought it to the next hearing.

56.   The Third OSC, and exhibits A – F, (attached to this Complaint as **Exh. J**) contained the following evidence of sewer service:

- **Exhibit A was the Torres affidavit service**.  In his affidavit of service, process

server Harry Torres, contended that on January 26, 2006, he served the Collection Lawsuit on Ms. Stinson by delivering and leaving the documents with "Robert Stinson" a resident/relative at Ms. Stinson's dwelling which he listed as 236 E 82nd St. Apt 4B, NY, NY 10028-2798. Mr. Torres described "Robert Stinson" as a 14-20 year old white male who was approximately 5'4"-5'8" tall and weighed 131-160 lbs. Mr. Torres further attested that "Robert Stinson" told him that Ms. Stinson was neither in the military nor dependent on a person in the military. *Id*.

- **Exhibit B was the February 26, 2009 NYC DCA Assurance of Discontinuance with process server Harry Torres**. In the Assurance, the NYC Department of Consumer Affairs banned Torres from serving process in New York City for five years, banned him for five years from having an ownership interest greater than 10 percent for any process serving agency that serves process in New York City, and hit him with a $1,000 fine.

- **Exhibit C was her 2003 – 2008 W-2 tax forms**. The Affidavit of Service claims service was made on January 26, *2006* to Ms. Stinson's supposed home in Manhattan. However, Ms. Stinson provided her W-2 tax forms for 2003 – 2008 showing her address during this entire time was actually in Greenwich, CT.  This was both 3 years prior to the date of alleged service, and 2 years after the date of alleged service. The employer from 2003 – 2008 was the same: the Catholic Foreign Mission. Her address from 2003 – 2008 on the W-2 forms was the same: 163 E. Elm St., Greenwich, CT 06830. This documents her affidavit where she swore that she, in fact, lived at the Greenwich, CT address that entire time. As Ms. Stinson stated in her Affidavit, p. 2, ¶ c, she moved from the Manhattan to the

Greenwich, CT address in June, 2002, 4 years prior to the alleged NYC service.

- **Exhibit D was the Connecticut DMV records**. The Connecticut DMV records show that the driver's license was issued on January 13, 2005 (one year prior to the date of alleged service) and expired on February, 28, 2017 and had the same Greenwich, CT address as on the W-2 address. Ms. Stinson had the DMV issue the DMV records on February 27, 2018 so she could use it as documentary proof in support of her order to show cause.

- **Exhibit E was the Connecticut voter registration**. At her request, the office of the Registrar of Voters for the Town of Greenwich sent Ms. Stinson a letter dated March 19, 2018 – on city letterhead – confirming that Ms. Stinson registered to vote in Greenwich in 2004 through October 2016 when her registration apparently expired.

- **Exhibit F was the death certificate of her son**. The only person with the first name "Robert" who ever lived with Ms. Stinson was her son, Robert Hosey Jr., who tragically died in 1981 when he was three years old. Notably, his full name Robert Hosey Jr.—is different than the name "Robert Stinson" reported by process server Mr. Torres. As painful as it was for her, Ms. Stinson had to obtain an official death certificate for her son so that she could attach it to her OSC. Having to file an affidavit with this evidence would obviously re-open the hole in the soul of any parent who had lost a young child. To say it was painful could not even begin to capture the harm.

57.    Ms. Stinson took off from work and spent a great deal of time, effort, as well as expense, in obtaining, copying, and organizing the documents that became the exhibits to the Third OSC.

*Attempting to dupe Ms. Stinson or continue to fight OSC*

58.    Ms. Stinson's proof of sewer service was uncontestable, and, as will be seen, uncontested. No doubt Houslanger would drop the lawsuit and agree to vacate the judgment given this overwhelming proof.

59.    And it initially appeared that was exactly what Houslanger and DEMI were going to do.

60.    Specifically, on April 5, 2018, Houslanger sent Ms. Stinson a letter enclosing two copies of a document with the caption of the lawsuit and entitled "Mutual Stipulation Vacating Judgment, Discontinuance With Prejudice & General Release." (hereinafter "Stipulation Vacating Judgment")

61.    In the cover letter, Houslanger stated that their client had decided to drop the case "due to the passage of time beyond the retention period of the original creditor," and "the inability to obtain witnesses and documents to support the underlying claim." *See* **Exh. M (April 5, 2018 Letter and Stipulation Vacating Judgment)**.[5]

62.    Remarkably, the letter deceptively attempted to mislead by reassuring, "**We wanted to advise you of this so that you may avoid further inconvenience of coming to Court**." *Id.* (emphasis added)

---

[5] The full body of the letter states (emphasis in the original):

Dear Ms. Stinson:

Due to the passage of time beyond the retention period of the original creditor, and due to the inability to obtain witnesses and documents to establish the underlying claim, our client has decided to discontinue the above matter. We wanted to advise you of this so that you may avoid further inconvenience of coming to Court.

Enclosed, please find three (3) copies of a **Mutual Stipulation Vacating Judgment, Discontinuance With Prejudice With Prejudice & General Release**. Please sign two (2) copies and return them to our office in the self-addressed stamped envelope provided for your convenience. Upon your receipt, we will countersign, file an original in Court and provide a fully executed copy to you. Please keep one original for your records.

Your cooperation in this matter is appreciated. **Should you have any questions, feel free to contact our office directly at (631) 427-1140.**

63. The letter affirmatively represented to Ms. Stinson – as it would to any consumer, least sophisticated, reasonable, or otherwise – that Houslanger, who received the Third OSC and exhibits, was forthrightly admitting it had no evidence to support its claims, and was seeking to assist Ms. Stinson to "avoid further inconvenience of coming to Court" by agreeing to vacate the default judgment.

64. As additional reassurance attorney Bryan Bryks included a friendly handwritten note with his business card and included it with the Letter and Stipulation Vacating Judgment. The note said, "Please contact me if you have any questions or concerns!" *See* **Exh. N (Bryks note)**.

65. By use of the cover letter, along with the dense language of the Stipulation Vacating Judgment, Houslanger and DEMI did everything they could to obfuscate the fact that the Stipulation would release any claims Ms. Stinson may – and does – have against Houslanger and DEMI. [6]

---

[6] The full text of the Stipulation Vacating Judgment states, after the caption of the action, the following:

IT IS HEREBY STIPULATED AND AGREED, by and between the Attorney for the Plaintiff/Judgment Creditor and the Defendant/Judgment Debtor herein:

1. Due to the passage of time beyond the retention period of the original creditor, and due to the inability to obtain witnesses and documents to establish the underlying claim, the Judgment entered by the Clerk of the Civil Court of the City of New York, County of New York, on May 26, 2006 in the sum of $8,900.12, and the Transcript of Judgment issued on September 18, 2017 in the sum of $8,940.12 in the above entitled action is hereby vacated and all bank restraints, income executions and all other judgment enforcement remedies are hereby vacated.

2. The parties further agree that the above entitled action, and any counterclaims, if any, be and the same is hereby discontinued with prejudice, and without costs to either party as against the other. Any Orders to Show Cause or pending Motions are hereby withdrawn with prejudice.

3. Upon execution of this stipulation, Plaintiff, Demi, LLC, the assignee of Discover, shall cease all collection and judgment enforcement remedies regarding the Account (ending in 5963), including any and all related fees, charges, interest, or monies, and further agree to release and forever discharge all claims, demands, liabilities, damages or losses against Defendant, her heirs, assigns, co-signors, and/or guarantors, agents, and attorneys, related to the Account, from the beginning of time to the date of execution of this agreement by all parties; and likewise, Defendant, Barbara J. Stinson, upon the execution of this Stipulation, shall release and forever

66.    Paragraph 1 of the Stipulation Vacating Judgment certainly comport with the cover letter in that Houslanger and DEMI are vacating the default judgment and releasing any bank restraints or garnishments because they admit they have no evidence to support their claims. The first paragraph, written in fairly straightforward language states the judgment is being vacate "due to the inability to obtain witnesses and documents to establish the underlying claim."  Likewise, Paragraph 2 is fairly short, and dismisses the lawsuit without limiting the rights of the consumer.[7]

67.    However, paragraph 3 is an entirely different matter.

68.    The first sentence of paragraph 3 goes on for an incredible ***13 lines*** and is some of the most dense, convoluted, legalese imaginable. There are no less than 53 commas in this labyrinthine first sentence, creating 8 lists which are full of obviously obtuse and unnecessary phrases like "its former, present  and future parents,  subsidiaries and/or affiliates,  whether direct or indirect,  and any and all former, present and future officers, directors, employees,

---

discharge Demi, LLC, Discover, Houslanger & Associates, PLLC, its former, present and future parents, subsidiaries and/or affiliates, whether direct or indirect, and any and all former, present and future officers, directors, employees, representatives, predecessors, successors, agents, attorneys, independent contractors or assigns, from any and all claims, demands, liabilities, damages, losses or expenses relating to the account and attempts  to collect same,  including any and all alleged improper debt collection acts, including claims alleged to be based upon federal FDCPA and/or other New York laws which may govern the collection of debts, from the beginning of time to the date of execution of this agreement by all parties.  Any sums previously received, if any, may be retained by the Plaintiff. All collection activity shall cease forever after.

4.    It is further stipulated that a facsimile copy may be submitted to the Court in lieu of the original and that Plaintiff's counsel shall submit this stipulation to the Court on behalf of both sides.

5.    Defendant may obtain any certificates of disposition at her own cost should he so desire.

---

7 There is a phrase that the consumer dismisses "any counterclaims, if any."  However, given the case was closed because of the entry of the default judgment, a consumer would be precluded from filing a counterclaim. Even if the judgment was vacated and the case was restored to the calendar, it is extremely a pro se consumer would file a counterclaim or even know she had a right to do so. Lastly, even in the unlikely even a counterclaim was filed, and the counterclaim dealt with the debt collection practices of the plaintiff in the collection lawsuit, a dismissal of such a counterclaim would not affect the rights a consumer would have against Houslanger, who is not a party to the collection lawsuit and thus is not susceptible to being sued in a counterclaim.

representatives, predecessors, successors, agents, attorneys, independent contractors or assigns." The purpose of this language is to conceal from any *pro se* consumer, least sophisticated or otherwise, that the consumer is releasing any rights she may have against DEMI, but also non-parties including Mr. Houslanger, Mr. Blake, and Mr. Bryks.

69.   To the degree that the first 6 lines of paragraph 3 are intelligible to a *pro se* consumer, it states that Houslanger and DEMI cease all collection and judgment enforcement remedies regarding the putative debt. Of course the vacating of the judgment means, by definition, the judgment cannot be enforced, and the discontinuance with prejudice means, by definition, that the putative debt cannot be collected upon.

70.   There is no purpose for the first six lines of paragraph other than to obfuscate lines 7 – 13: it merely restates what is agreed to elsewhere. Lines 7-13, in even more dense language, would shield Houslanger and DEMI from the very real claims Ms. Stinson has against Houslanger and DEMI that are brought by way of this action.

71.   The purpose of the letter and the Stipulation Vacating Judgment is to dupe *pro se* consumers into releasing the very rights the FDCPA was designed to protect. Whether Ms. Stinson was ultimately duped is immaterial as both GBL 349 and the FDCPA use an objective standard to determine whether a communication is deceptive that does not turn on the subjective understanding of the consumer.[8]

---

8 The FDCPA was designed for the protection of all consumers, "even the naive and the trusting, against deceptive debt collection practices." Whether a debt collector complies with the FDCPA is determined from the perspective of the "least sophisticated consumer." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir.1993). The Second Circuit applies an objective test based on the understanding of the "least sophisticated consumer" in determining whether a communication is "false, deceptive or misleading" under 15 U.S.C. 1692e and its subsections. *Id*. "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Id*. at 1318. The standard "protects the naive and the credulous" *Id*. at 1319. *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who

72.    Further a pro se consumer may not notice the clause that he has "withdrawn with prejudice" the Order to Show Cause.  While Ms. Stinson had her funds released in the February 2018 order, other consumers who had their wages garnished or bank account funds seized would unknowingly forfeit those funds.

73.    Attorney Bryan Bryks is personally liable for his individual involvement in trying to dupe Ms. Stinson into signing the Stipulation Vacating Judgment that buried and obfuscated a release for Houslanger and DEMI. By including the note with his card along with the April 5, 2018 Letter and Stipulation Vacating Judgment, Mr. Bryks acknowledged his involvement and approval in sending out the same.[9]

74.    While Ms. Stinson found the language in the April 5, 2018 Letter and Stipulation Vacating Judgment confusing, fortunately she did not ultimately get duped into signing it.

75.    On April 12, 2018, Ms. Stinson, *pro se*, went to Court to appear for the hearing on her Third OSC.

76.    Houslanger and DEMI had no evidence to counter the irrefutable documentary evidence of sewer service, and did not file a written opposition. Indeed, they admitted in their April 5, 2018 letter they had no evidence to support their claim.

77.    Moreover, Houslanger and DEMI had no intention on calling the process server, Harry Torres, to testify at a traverse hearing.  As demonstrated in Exhibit B to the Third OSC, Mr. Torres, the process server, was forced to surrender his process server license, pay a fine, and be

are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

9 In addition, on information and belief, when Mr. Bryks appears at hearings for collection lawsuits he, as a matter of course, insists on the inclusion of a release to Houslanger and his client in any vacature or settlement. These are form agreements that Houslanger brings as a matter of course to court. All or almost all of the consumers at these hearings are *pro se*, and Mr. Bryks regularly attempts to dupe or pressure them into signing stipulations or settlements that, buried deep down, include a release of Houslanger and his client.

forever barred from serving process in the future because of widespread sewer service charges brought against him by the NYC Department of Consumer Affairs.

78.   Despite this, Houslanger and DEMI forced Ms. Stinson to go to Court for a hearing on the Third OSC despite having no good faith basis to continue to oppose the Third OSC.  This violates the FDCPA. *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 138 (2d Cir. 2017) ("We hold that a debt collector engages in unfair or unconscionable litigation conduct in violation of section 1692f when, as alleged here, it in bad faith unduly prolongs legal proceedings or requires a consumer to appear at an unnecessary hearing.")

79.   Further, at the April 12, 2018 hearing, Houslanger and DEMI refused to vacate the default judgment despite the irrefutable – and unchallenged – evidence if Ms. Stinson did not agree to release any claims she might have against them.

80.    By their conduct, DEMI and Houslanger held over Ms. Stinson's head the risk that the Court may not grant her motion to vacate the 12 year old default judgment, and that they could garnish her wages to attempt to satisfy a judgment equaling half her annual salary.

81.   Ms. Stinson was afraid, but also felt that the debt collectors should not be able to get away with what they were doing with her. She stayed strong when most consumers would have given up.

82.   When Houslanger realized they could not dupe or strong-arm Ms. Stinson to sign the release, they asked the Court for an adjournment of the hearing on the Third OSC.

83.   The adjournment was sought for no other purpose than to continue to wear down Ms. Stinson, to pressure her to make a payment, or to delay in hopes she would default at the next hearing. This bad faith is demonstrated by the fact that Houslanger and DEMI had no evidence to

counter the irrefutable documentary evidence of sewer service, would not be able to do so, and did not file a written opposition. Indeed, they admitted in their April 5, 2018 letter they had no evidence to support their claim.

84.    Ms. Stinson had already been to the courthouse nearly a half dozen times over approximately three months to fight a default judgment where the process server claimed to have served her dead son.

85.    The Court would not make a ruling from the bench. Rather, the Court took the matter under advisement and set a date for Ms. Stinson to again return to the courthouse, and again miss work.

86.    Fortunately, the Court issued an order prior to the date of the next hearing. On May 22, 2018, the Court issued a decision vacating the default judgment against Ms. Stinson and dismissing the case. *See* **Exh. O (Order vacating judgment and dismissing)**

87.    This entire ordeal lasted from February 12, 2018 to May 22, 2018. During this time, Ms. Stinson lived in constant fear of what would happen to her in the event she lost the case. This stress took its toll on Ms. Stinson.

88.    Ms. Stinson now files this action to hold Defendants accountable. As Congress intended in enacting the FDCPA, Ms. Stinson by way of this lawsuit is effectively acting as a private attorney general for the benefit of consumers generally. "In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others." *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008).

**HOUSLANGER AND ITS CLIENTS SYSTEMATICALLY SEEK TO GUT
PROTECTIONS UNDER THE FDCPA WITH THEIR PATTERN AND PRACTICE OF
ATTEMPTING TO DUPE, AND IF UNSUCCESSFUL TO STRONG-ARM, A MUTUAL
RELEASE**

*Gutting FDCPA protections by systematically requiring releases for the debt collector*

89.   In recent years, Legal Services attorneys representing low-income consumers have seen

Houslanger demand *all* consumers, who are seeking to vacate a default judgment or to

discontinue an action, sign these mutual releases that include language that is identical or

substantially similar to the language used with Ms. Stinson. The mutual release is demanded no

matter how strong the evidence is that the judgment was entered by way of a false affidavit of

judgment, was for a debt that was not owed or was time barred, or was for the collection of an

assigned judgment for which no notice of assignment was sent, among other possible consumer

claims or defenses. Houslanger, on behalf of itself and putative judgment creditor clients such as

Palisades, is attempting to eviscerate the very protections the FDCPA was enacted to provide.

*Pro se* consumers are duped or pressured by Houslanger (and its clients) into signing releases of

claims. They hold over the consumers' heads the threats that Houslanger may prevail at the OSC,

and that the consumer will then lose the restrained money in their bank accounts, or that, for 20

years from the date of the entry of judgment, that their wages will be garnished and bank

accounts restrained in the future.

*ISAAC LEVY: another consumer Houslanger attempted to dupe then, when unsuccessful,
attempted to strong-arm, with the same form Stipulation Vacating Judgment and cover letter.*

90.   The Stipulations Vacating Judgment are form documents that debt collection law firms

such as Houslanger as well as debt-buyer plaintiffs in collection lawsuits use as a matter of

course.

91.    For example, shortly after filing this action the undersigned will be filing a separate

action in the Eastern District of New York against Houslanger for essentially doing to another consumer what it did to Ms. Stinson. The action will be captioned *Isaac Levy v. Houslanger & Associates, PLLC, et al*.

92.   In *Levy*, the consumer had his bank account frozen for a judgment on a suit he was never served with or knew about.  Just as with Ms. Stinson, Mr. Levy, *pro se*, filed an initial OSC but could not immediately view the affidavit of service because his file was in archives. Houslanger had frozen Mr. Levy's account on behalf of its client, Palisades Collection, among one of the largest debt buyers in the nation. Just as with Ms. Stinson, Houslanger attorney Bryan Bryks executed the Affirmation in Opposition to the OSC, (the "Opposition") and did not provide Mr. Levy with the Opposition until the day of the hearing. Just as with Ms. Stinson, the Opposition included the affidavit of service, which Houslanger and Palisades were able to cite to in their Opposition but which Mr. Levy did not have the opportunity to review prior to drafting his OSC. Just as with Ms. Stinson, Houslanger and Palisades planned to force Mr. Levy to either lose at the hearing, or, at best, get an adjournment to file a supplemental OSC to challenge the facts alleged in the affidavit of service. Just as in Stinson, Houslanger forced Mr. Levy to obtain an adjournment to pressure him to make a payment, or in the hope that he would not appear and thus default at the next hearing. Just as with Ms. Stinson, Mr. Levy would have to take more time off work to fight the sewer service judgment. Even worse than for Ms. Stinson, the adjournment allowed Houslanger and Palisades to apply more pressure on Mr. Levy as he needed access to his restrained bank account to pay for rent and other essential expenses for himself, his wife, and his newborn daughter.

93.   On July 6, 2018, Houslanger and Palisades sent a Letter and Stipulation Vacating Judgment that used identical or nearly identical language Houslanger and DEMI sent to Ms.

Stinson. The Letter admitted that Houslanger and Palisades had decided to drop the case "due to the passage of time beyond the retention period of the original creditor," and "the inability to obtain witnesses and documents to support the underlying claim." *See* **Exh. P (July 6, 2018 Letter and Stipulation Vacating Judgment)**.

94.    Just as with Ms. Stinson, Houslanger buried deep in the third paragraph, in the 7th line of a 13 line single sentence, a release of any FDCPA or other claims Mr. Levy may have against Palisades and against Houslanger, who was not a party in the collection action.

95.    Mr. Levy first saw the affidavit of service when it was attached to the Opposition to his OSC. *See* **Exh. R (October 15, 2002 Levy Affidavit of Service)**. In the affidavit of service, process server Gerald Murray of Capital Process Servers averred in his affidavit of service that on October 11, 2002 he delivered at Mr. Levy's purported "dwelling residence" at 151 1st Ave. # 42, New York, NY 10003 the summons and complaint for the collection lawsuit "to "Jane Doe: - Cotenant." (hereinafter, the "Manhattan address")

96.    On July 16, 2018, Mr. Levy filed a Supplemental Affidavit in Support of his Order to Show Cause to challenge the specific factual allegations in the affidavit of service.  *See* **Exh. Q (July 16, 2018 Supp. Affidavit).**

97.    In the Supplemental Affidavit, Mr. Levy swore that from May 2002 – January 2004 he lived in Brooklyn at 505 Johnson Ave., Unit 4, Brooklyn, NY (the "Johnson Address"), and from May 2000 until May 2002 in Brooklyn at 1024 Greene Ave, Brooklyn, NY (the "Green Address"). Mr. Levy also swore that he has never – at any time – lived in the Manhattan Address identified in the Affidavit of Service, nor has he known anyone who ever lived at that address. Mr. Levy also noted that the process server was notorious for sewer service and was disciplined by the NYC Department of Consumer Affairs. In support, Mr. Levy provided the following documentary

evidence as exhibits that demonstrate his residence was at the Brooklyn Address:

a.  Exhibit 1: land-line telephone bills from October 2002 through November 2002 at the Johnson Address.

b.  Exhibit 2: the final 2004 electric, gas, and hard-line telephone bills at the Johnson Address.

c.  Exhibit 3: correspondence from the property management company listing his Johnson Address, including a January 29, 2003 "insurance request letter," and payment stubs for rent at his Brooklyn Address covering November 2003 and December 2003.

d.  Exhibit 4: wage statements from his employers in 2002 and 2003 listing his Johnson Address.

e.  Exhibit 5: the lease for his Greene Address apartment dated June, 2000.

f.  Exhibit 6: copies of rent receipts from September 2001 through May, 2002 for his Greene Address Apartment.

g.  Exhibit 7: list of process servers disciplined by the New York City Department of Consumer Affairs ("DCA") including Gerald K. Murray, the process server who allegedly served Mr. Levy.

h.  Exhibits 8: DCA records describing, in great detail, specific documented instances of sewer service by process server Gerald Murray. This includes a DCA Consent Order with Gerald Murray where he surrendered his process server license because of repeated, documented instances of sewer service.[10]

98. Houslanger did not file a response to the Supp. OSC because they had nothing to rebut the overwhelming documentary evidence Mr. Levy presented, and by their own admission they did not have the documents or witnesses necessary to prove this claim.

99. Nonetheless, at the August 8, 2018 hearing, Houslanger and Palisades still refused to – and continued to oppose – vacating the default judgment without Mr. Levy releasing the claims he may have against Houslanger and Palisades.

100.   Mr. Levy was *pro se* at the August 8, 2018 hearing, as he had been throughout the case.

101.   Houslanger and Palisades had hung over Mr. Levy's head the possibility that the judgment may not be vacated, and that they would be able to clear out his bank account

---

10  Exhibit 8, which was attached to the Supp. OSC is not attached to this complaint given its length, 95 pages.

containing funds of approximately $11,000. This was an enormous pressure on Mr. Levy. He desperately needed that money to pay rent, and other essentials, as well as to support his wife and newborn child.

102.    But Mr. Levy stayed strong.

103.    By the end of the August 8, 2018 hearing, the Court signed an order granting all relief sought by Mr. Levy in his OSC, and dismissing the collection lawsuit.

### WANDA CEPEDA: a consumer with a sewer service judgment successfully strong-armed by Houslanger to release her potential claims

104.    Houslanger engaged in similar deceptive conduct in the action *Colonial Credit Corporation v. Wanda Then*, CV-030370-05/NA in the District Court of Nassau County.

105.    Ms. Cepeda was alleged to have been served by "nail and mail" service on November 9, 2005. However, Ms. Cepeda was never served in this matter, and the allegations regarding service were false. Further, Ms. Cepeda did not owe any debt to the Plaintiff. It allegedly arose from a fitness club which Ms. Cepeda never belonged to. Ms. Cepeda had previously been a victim of identity theft.

106.    On or about February 14, 2006 a default judgment was entered against Ms. Cepeda in the amount of One Thousand Three Hundred Seventy-Five Dollars and Thirty-Seven Cents.

107.    As with Mr. Levy, Ms. Cepeda's bank account was frozen by Houslanger on behalf of the debt buyer Palisades, who had allegedly been assigned the debt by Colonial Credit Corporation.

108.    Ms. Cepeda never received either a copy of the judgment or the notice of entry of the judgment. She did not learn about the lawsuit until November of 2017 when after a failed attempt to withdraw funds she realized her bank account was frozen.

109.    Just as with Ms. Stinson, the Affidavit of Service was falsified. The process server did not describe any attempt whatsoever to locate a place of employment for Ms. Cepeda. Instead, the affidavit claimed that a neighbor allegedly consulted, "Jane" Powell, did not know Ms. Cepeda's place of employment. Ms. Cepeda did not know of any neighbors at that address with the last name Powell. All attempts at service were made on weekdays; no weekend attempts were made. The address given was not where Ms. Cepeda resided at the time of service and had not lived at that address for nearly two years. She did not even reside in the same state as the address given: she resided in Maryland, not New York, at the time of the alleged service.

110.    The process server had no reason to believe that Ms. Cepeda still resided at the address in the affidavit. Ms. Cepeda had updated her address with the Maryland DMV, the New York DMV, and the post office when she had moved. She then updated her address again when she moved from Maryland to Florida with the Florida DMV and the post office.

111.    In the Supplemental Affidavit, Ms. Cepeda swore that she moved on or around December 2004 from the address allegedly served (1 Holland Avenue, Elmont, NY) to 47 Golden Ave., Deer Park, NY. She then moved to Maryland on or around August 2005, and resided there on the date of alleged service (November 9, 2005). Lastly the name used in the affidavit of service, "Wanda Then," had not been used by Ms. Cepeda since 2002.

112.    Ms. Cepeda provided the following documents to establish that the address in the affidavit was incorrect:

> a. Exhibit 1: Maryland DMV record confirming that Ms. Cepeda resided in Maryland at the time of service of process.
>
> b. Exhibit 2: New York DMV record confirming that Ms. Cepeda no longer lived at the address at the time service was allegedly made.
>
> c. Exhibit 3: Verification that Ms. Cepeda had been the victim of identity theft from the Internal Revenue Service.

113.    The case was an unmistakable instance of sewer service. Houslanger did not file a

response to the OSC because they had nothing to rebut the overwhelming documentary evidence Ms. Cepeda presented, and by their own admission they did not have the documents or witnesses necessary to prove this claim.

114.     On February 20, 2018, Ms. Cepeda entered into the same Mutual Stipulation with Houslanger that Ms. Stinson entered into. Ms. Cepeda was pressured into entering into this agreement while she was out of the country and thus dependent on her then-frozen bank account for any money. Just as with Ms. Stinson and Mr. Levy, Houslanger buried deep in the third paragraph, in the 7th line of a 13 line single sentence, a release of any FDCPA or other claims Ms. Cepeda may have against Houslanger and Palisades.

### *Defendants inflicted damages on Ms. Stinson*

115. When Ms. Stinson first learned of the judgment she was beyond distraught. She burst into tears and was afraid because the amount of the judgment was half her yearly salary and she feared that she would have to pay the amount and she would lose the home that she currently shares with her daughter.

116. Ms. Stinson had to repeatedly ask her employer to take time off to go to Court to fight Defendants' misconduct.  Ms. Stinson is nursing assistant at a nursing home of elderly priests. Ms. Stinson was apprehensive and embarrassed that her employer would think less of her or harbor negative perceptions of her as a person and her trustworthiness as an employee because of the (false) accusation that she did not pay a debt.

117. During the time she was fighting the Court battles and even after Ms. Stinson found herself repeatedly crying, including at the multiple court appearances. She had difficulty sleeping, often waking up in the middle of the night worrying about the case and the uncertainty it brought to her immediate financial future.

118. The lack of sleep made it difficult for Ms. Stinson to concentrate at work because she was often drowsy from lack of sleep. As Ms. Stinson continued to lose more and more sleep due to the severe stress she was experiencing from the uncertainty of the case.

119. In order to defend herself, Ms. Stinson was forced to obtain her son's death certificate as evidence. This was the first time that she had seen the death certificate and she relived the pain and grief she experienced upon the traumatic death of her three-year-old son.

120. Ms. Stinson felt devastated for long periods of time. She was being abused by some big thing she had no control over. This was one of the worst experiences she has ever had to endure in her life.

121. The sleep deprivation and emotional upheaval began to seriously take its toll. Ms. Stinson has two fairly large dogs who, as dogs often do, get into fights with each other. This was a normal occurrence. Ms. Stinson would always stay out of the way of the dogs and do something to distract them, and they would break it up. But during this time when she was being dragged back and forth to court, Ms. Stinson, in a fog and distracted by long nights of sleep deprivation and stress, inexplicably decided to break up a fight between her two dogs by physically separating them. The dogs tore into Ms. Stinson hands, puncturing and ripping through the muscle and ligaments in her hand. She was seriously injured. Ms. Stinson was left with a fractured bone in her right hand and a severed nerve in her left.

122. Since the injury, Ms. Stinson has been out of work recovering. She goes to occupational therapy twice a week. The injuries have so affected the mobility of her hand that when she places her hand on a flat service she can barely raise her ring finger.

123. Although Ms. Stinson is fortunate to have salary continuation from her job as a nursing

home assistant she has spent close to $650.00 in copays and first aid supplies in taking care of her injuries.

124. Ms. Stinson also missed work for long period of time and incurred copying, postage, and transportation expenses for having to repeatedly go to Court.

### D.    COUNT 1: FAIR DEBT COLLECTION PRACTICES ACT
### (as to all Defendants)

125. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

126. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

127. Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance").

128. The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was allegedly incurred primarily for family, personal or household purposes. DEMI and Houslanger admit in their verified complaint that the

putative debt arose from a "consumer credit transaction."

129. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

130. For the reasons stated in the "Parties" section of this Complaint, each Defendant is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

131. Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; using false representation or deceptive means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law; taking or threatening to take any nonjudicial action to effect dispossession or disablement of property the property is exempt by law from such dispossession or disablement.  Defendants also engaged in unfair or unconscionable litigation in violation of 15 U.S.C. § 1692f by unduly prolonging the legal proceedings in bad faith and requiring Plaintiff to appear at unnecessary hearings. *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 138 (2d Cir. 2017).

34

**E.**   **COUNT 2: NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.***

**(As to all Defendants)**

132. Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged herein.

133. New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

134. An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). An individual may also be awarded punitive damages.

135. As enumerated in the Statement of Facts, Defendants violated N.Y. Gen. Bus. Law § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses that have broad impact on consumers at large.

136. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

137. As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

**F.**   **COUNT 3: CONVERSION**

**(As to DEMI and Houslanger)**

138. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted

35

and realleged herein.

139. The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

140. Property subject to conversion includes, *inter alia*, readily identifiable funds garnished from wages.

141. Defendants Houslanger and DEMI intentionally and without authority, assumed and exercised control over Plaintiff's wages and money, interfering with his right to possession of the same, by continuing to collect in violation of the order staying collection and, moreover, by willfully refusing to comply with a court order to return the previously garnished funds forthwith.

142. The improper restraint by Defendants Houslanger and DEMI of Plaintiff's money without qualification, which harmfully interfered with Plaintiff's rights to control his own property, constitutes conversion.

143. For the reasons stated in the statement of facts, the conduct of Defendants Houslanger and DEMI is gross, wanton or deliberate and demonstrates a high degree of moral culpability. Further, said Defendants conduct as alleged in the statement of facts demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts by said Defendants. For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages against Defendants Houslanger and DEMI.

### G.    COUNT 3: NY JUDICIARY LAW § 487

### (As to the PLLC, Todd Houslanger, and Bryan Bryks)

144. New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

145. As enumerated in the Statement of Facts, the PLLC, Todd Houslanger, and Bryan Bryks violated Judiciary Law § 487.

146. Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for violations of N.Y. Judiciary Law § 487 by the PLLC, Mr. Houslanger, and Mr. Bryks, and Plaintiff so seeks.

### H.    JURY DEMAND.

147. Plaintiff demands a trial by jury.

### I.    PRAYER

148.    WHEREFORE, Plaintiff requests the following relief:

a.    A declaration that all Defendants have committed the violations of law alleged in this action;

b.    Statutory damages under 15 U.S.C. § 1692k and GBL 349;

c.    Reasonable attorney's fees and costs;

d.    Actual damages;

e.    Treble damages;

f.      Exemplary and punitive damages;

g.      An order, pursuant to GBL 349(h), enjoining and directing Defendants to cease violating that statute;

h.      Prejudgment and post judgment interest as allowed by law;

i.      All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated:  Brooklyn, New York
        December 5, 2018

                        Respectfully submitted,

                        /s/

                        Ahmad Keshavarz
                        The Law Office of Ahmad Keshavarz
                        16 Court St., 26th Floor
                        Brooklyn, NY 11241-1026
                        Phone: (718) 522-7900
                        Fax:    (877) 496-7809
                        Email: ahmad@NewYorkConsumerAttorney.com